WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR 12-08135-PCT-JAT |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Harry McCabe, Sr. | |
| Defendant. | |

Pending before the Court is Defendant's Motion to Suppress Evidence Seized in Violation of the Fourth Amendment (Doc. 39).  The Court held an evidentiary hearing on the Motion to Suppress on October 30, 2012 at 2:45 p.m.  The Court now rules on the Motion.[1]

## I.    BACKGROUND

Defendant has been charged with four counts relating to an alleged assault with a dangerous weapon that occurred on April 30, 2012.  (Doc. 36).  At approximately 8:20 p.m. on April 30, 2012, the dispatcher at the Dilkon Police Department received a phone call from a female caller reporting that W.W. was shot while herding sheep.  Government's Exhibit 1 at 00003.

---

[1]  In his Motion to Suppress (Doc. 39), Defendant solely argues that there were no exigent circumstances to justify Officer Yazzie and Lieutenant Lee entering the Hogan without a warrant.  At the suppression hearing, for the first time, Defendant made an argument that there was no probable cause for an arrest and made an argument that the rifle was not actually in plain view.  Accordingly, the Court will also address Defendant's newly-made arguments in this Order.

1     Officer Parold Yazzie testified that he was working the shift from 3:00 p.m. to
2     11:00 p.m. at the Dilkon Police Department when the call came in.   Officer Yazzie
3     testified that, immediately after dispatch relayed the information about the call to him, at
4     about 8:21 p.m., he immediately responded and began driving to the residence of Agnes
5     and Benny Lee (the "Lee Residence").   Officer Yazzie testified that he drove to the Lee
6     Residence with the patrol vehicle's lights and siren on at a speed of approximately 85
7     miles per hour.   Lieutenant Emerson Lee testified that he was driving home in his
8     unmarked police vehicle from his day-time shift at the Dilkon Police Department when
9     he began to hear radio traffic with dispatch.   Lieutenant Lee testified that, after calling
10    into dispatch from his cell phone and learning that Officer Yazzie was responding to the
11    call alone, he decided to respond to the Lee Residence to provide back-up for Officer
12    Yazzie.   Officer Yazzie arrived at the residence at approximately 8:42 p.m. and
13    Lieutenant Lee arrived at the residence at approximately 8:43 p.m.   Government's
14    Exhibit 1 at 00003.   Officer Yazzie and Lieutenant Lee testified that, while Officer
15    Yazzie made contact with W.W., Lieutenant Lee stayed behind the patrol vehicles,
16    approximately fifteen yards from the residence, to provide cover for Officer Yazzie.

17    Officer Yazzie testified that, at the Lee residence, he observed W.W. with gashes
18    through his cheek, a bullet wound to his right temple, and dried blood on the front of his
19    shirt, pants, hands, and face.   Government's Exhibit 5.   Officer Yazzie testified that
20    W.W. complained of pain to his head and told police that he and "H" were at Leland
21    Anthony's Hogan (the "Hogan") when they got into a fight.   Officer Yazzie testified that
22    W.W. told him that he and "H" had been drinking all day.   Officer Yazzie testified that
23    W.W. told him that "H" shot him and, when Officer Yazzie later asked W.W. who "H"
24    was, W.W. told him that "H" was Harry.   Officer Yazzie testified that W.W. told him that
25    he and "H" had both been "staying" at the "Hogan" and both worked herding sheep on
26    Leland Anthony's property.   Officer Yazzie testified that W.W. told him that, after he
27    was shot, he ran to the Lee residence.

28    Officer Yazzie and Lieutenant Lee testified that, after Officer Yazzie obtained

this information from W.W., Lieutenant Lee stopped providing cover and took some pictures of W.W.'s injuries. Officer Lee testified that, at this time, the ambulance still had not arrived and was still twenty to twenty-five miles away. Officer Lee testified that he asked W.W. if, while they were waiting for the ambulance to arrive, W.W. could show Officer Yazzie and Lieutenant Lee the location of the Hogan where W.W. had last seen Defendant holding a shotgun. Officer Lee testified that W.W. agreed to show them where the Hogan was located and Officer Yazzie and Lieutenant Lee secured W.W. in the back of one of the patrol cars. Officer Yazzie and Lieutenant Lee testified that they then both drove to the Hogan, which was approximately five minutes driving distance away from the Lee residence. Lieutenant Lee testified that, at that time, the Hogan was in complete darkness and there were no streetlights or porch lights at the Hogan or in the area surrounding the Hogan. Lieutenant Lee testified that there was nothing surrounding the Hogan except vegetation and a sheep corral about 50 yards to the west of the Hogan. Lieutenant Lee testified that both patrol cars were positioned to shine their lights directly at the front door of the Hogan to provide Officer Yazzie and Lieutenant Lee some visibility.

Officer Yazzie testified that, when he arrived at the Hogan, he exited his vehicle with his weapon drawn and his flashlight out, and approached the front door of the Hogan. Lieutenant Lee and Officer Yazzie testified that Lieutenant Lee remained some distance behind Officer Yazzie to provide cover. Officer Yazzie and Lieutenant Lee testified that Officer Yazzie knocked on the front door and announced that he was a Navajo Police Officer in both Navajo and English languages. Officer Yazzie testified that, although there was no response, Officer Yazzie heard at least one person inside the Hogan and informed Lieutenant Lee that someone was inside the Hogan. Officer Yazzie testified that he knocked and announced in Navajo and English four times.

Lieutenant Lee testified that he then began to walk around the Hogan to determine if there were any windows. Lieutenant Lee testified that he avoided stepping into the light provided by the vehicles because he did not want to cause a shadow, but instead

used his flashlight as he walked around the Hogan.  Lieutenant Lee testified that, as he was walking around the Hogan, he observed bloodstains on the ground near a chair and on logs.  Officer Yazzie and Lieutenant Lee testified that they then pried the front door open.  Officer Lee testified that, inside the Hogan, the only light in the room was coming from the headlights from the patrol vehicles and Officer Yazzie's and Lieutenant Lee's flashlights.  Officer Yazzie testified that, with his flashlight, he observed Defendant sitting on a bed.  Lieutenant Lee testified that he observed that Defendant had a container in his hand.  Officer Yazzie testified that he instructed Defendant to get on the ground, while Lieutenant Lee covered Officer Yazzie from behind.  Officer Yazzie and Lieutenant Lee testified that Defendant refused to cooperate and Officer Yazzie forced Defendant to the ground and, when Defendant began to resist, Lieutenant Lee handcuffed him.  Officer Yazzie testified that, while shining his flashlight into the rest of the room, he observed, in plain view, the butt of a rifle sticking out from under a mattress. Lieutenant Lee testified that Officer Yazzie drew his attention to the rifle and Lieutenant Lee also observed the butt of the rifle sticking out about three to four inches from under a mattress.[2]  W.W. then identified Defendant as the person who shot him.  Government's Exhibit One at 00007.

Defendant argues that his Fourth Amendment right to be free from unreasonable searches and seizures was violated when Officer Yazzie and Lieutenant Lee entered his home to arrest him without a warrant.  As a result of this violation, Defendant seeks suppression of the rifle that was found under the mattress at the Hogan.

---

[2]  Defendant argues that the rifle was not in plain view and Officer Yazzie and Lieutenant Lee must have conducted a search to find the rifle.  Although there was some inconsistent testimony regarding the timing of removing ammunition from the rifle, both Officer Yazzie and Lieutenant Lee consistently testified that they saw the butt of the rifle sticking out from under the mattress.  There was no testimony that contradicted Officer Yazzie and Lieutenant Lee's testimony that they did not search the Hogan and that, when they first saw the rifle, it was sticking out from under the mattress.  Accordingly, based on the evidence introduced at the suppression hearing, the Court finds that the rifle was in plain view when Officer Yazzie first observed it.

## II.   LEGAL STANDARD

Generally, searches and seizures of a residence without a warrant are presumptively unreasonable. *Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id.* (internal citation omitted). For example, a warrant is not required when the government can show exigent circumstances that justified entry into the residence without waiting for a warrant. *Id.* ("Warrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.") (internal quotations and citation omitted). The exigent circumstances exception applies "where police have probable cause and where 'a reasonable person would believe that the entry was necessary to prevent physical harm to the officers or other persons.'" *Brigham City*, 547 U.S. at 402 (internal citation and brackets omitted).

> Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested . . . Alternatively, this court has defined probable cause as follows: when under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.

*United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (internal citations and quotations omitted; brackets in original).

"Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search or arrest until a warrant could be obtained." *United States v. Gooch*, 6 F.3d 673, 679 (9th Cir. 1993) (internal citation and quotation marks omitted). "Exigent circumstances are present when a reasonable person [would] believe that entry . . . was

1   necessary to prevent physical harm to the officers or other persons, the destruction of
2   relevant evidence, the escape of the suspect, or some other consequence improperly
3   frustrating legitimate law enforcement efforts." *Id.* (citation and quotation omitted;
4   alterations in original).  The nature of the underlying offense for which the arrest is being
5   made is "an important factor to be considered in the exigent-circumstances calculus."
6   *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).

7         Finally, for a plain view seizure to be valid, the "officer must have a lawful right
8   to access the object itself." *Horton v. California*, 496 U.S. 128, 129 (1990).

9       **III.   ANALYSIS**

10         Defendant argues that there were not exigent circumstances to enter the Hogan to
11   arrest Defendant without a warrant because the police should have known that, because
12   W.W. and Defendant had a verbal altercation before W.W. was shot, W.W. was likely the
13   only intended victim.  Defendant further argues that the conduct of the police in talking to
14   and photographing W.W., and the ten minutes that passed between the arrival of the
15   police at the scene and their approach of the Hogan indicate that they were not acting
16   expeditiously in apprehending someone that they thought was a danger.   Further,
17   Defendant argues, that if the police were actually concerned for their safety, they would
18   have remained at the Lee residence until additional police arrived or they would have
19   developed a plan for entry into the Hogan.

20         In Response, Plaintiff argues that there were exigent circumstances justifying the
21   entry into the Hogan solely for the purpose of arresting Defendant.  Specifically, Plaintiff
22   argues, that police had reason to believe that there was a threat to their safety or the safety
23   of others and it was of immediate necessity to secure the arrest of Defendant as soon as
24   possible.  The Court agrees that exigent circumstances justified the entry into the Hogan.
25   The Court also finds that Officer Yazzie and Lieutenant Lee had probable cause to arrest
26   Defendant.

27         Within twenty-five minutes of receiving a call that a man had been shot, Officer
28   Yazzie and Lieutenant Lee arrived at the victim's location.  Government's Exhibit One at

00003.  Upon arriving at the location, Lieutenant Lee stayed behind the police vehicles to provide cover for Officer Yazzie in the event that the shooter was still nearby.  After learning from the victim that "H," who was intoxicated, shot the victim with a rifle in the back of the head after the victim and "H" engaged in a minor verbal altercation and that the victim fled from the scene in fear for his safety, Officer Yazzie and Lieutenant Lee immediately learned the location where the alleged gunman had been last seen.  Upon arriving at that location, Lieutenant Lee again stayed behind to provide cover for Officer Yazzie because the two were unsure of the location of the alleged gunman or if the gunman would begin to shoot at them.  Officer Yazzie knocked and announced several times and heard movement within the Hogan.  Lieutenant Lee walked around the Hogan and noted that there was blood in a location consistent with the victim's description and was unable to obtain any visual on the alleged gunman, although movement inside the Hogan indicated someone was inside and refusing to respond to the call of the police. Officer Yazzie and Lieutenant Lee testified that they were in fear for their safety and the safety of any possible other victims inside the Hogan.  Officer Yazzie and Lieutenant Lee then pried the door open.

It is objectively reasonable, under these circumstances, that Officer Yazzie and Lieutenant Lee believed either they or another member of the public was in danger.  They knew that an intoxicated gunman had recently shot someone in the back of the head and the last location he was seen was the Hogan and that the gunman had previously been "staying at" the Hogan.  Less than an hour had passed between the time W.W. arrived at the Lee Residence after fleeing from the Hogan and the time the police approached the Hogan.  Ensuring that the gunman was no longer a danger to the public or to the police themselves was of paramount importance.  Upon their arrival at the Hogan, the police became aware that someone was in the Hogan, but refused to respond to their arrival or their inquiries.  The police observed blood on the ground in a location consistent with the victims' description.  The police had no way of determining the activities of the person inside in the Hogan.  Under these circumstances, it was objectively reasonable and there

were exigent circumstances justifying the actions of the police in prying open the door of the Hogan in an attempt to secure the safety of the police and the public.

Further, the facts in this case are similar to other cases where courts have found exigent circumstances justified a warrantless search/arrest. For instance, in *U.S. v. Al-Azzawy*, police were called to investigate a disturbance at a trailer park. 784 F.2d 890, 891 (9th Cir. 1985). Upon arrival, Williams told officers that Defendant, his neighbor, had threatened to shoot him, blow up the trailer park, and burn Williams' trailer. *Id.* Williams also told officers that Defendant had threatened him with a pistol the day before and he had seen Defendant with hand grenades and automatic weapons days earlier. *Id.* Police officers then surrounded Defendant's trailer with their guns drawn and ordered Defendant to come outside. *Id.* Defendant complied and was arrested. *Id.* Defendant then challenged his warrantless arrest, arguing that police did not have probable cause and there were no exigent circumstances to arrest him. *Id.*

The Court found that Defendant was under arrest as soon as police surrounded his trailer with weapons drawn. *Id.* at 894. The Court noted that Defendant's threat to his neighbor had been conditioned upon further conduct by his neighbor, all appeared calm around the trailer at the time of the arrest, there was no indication from Defendant that he might be presently violent or try to flee, and information concerning the automatic weapons and explosives was entirely hearsay. *Id.* Nonetheless, the Court found that the officers had enough information to reasonably believe that Defendant possessed illegal explosives and was in an agitated and violent state and there was a sufficiently substantial risk to human life to justify a warrantless arrest. *Id.*

In this case, the exigency was objectively greater than that in *Al-Azzawy*, because the victim told the police that less than an hour before, "H" had shot him at the Hogan in the back of the head with a rifle and the police saw the wound, the victim, and the blood surrounding the Hogan. Further, Defendant refused to respond to the police's attempts to ascertain his location and state of mind, although the police had reason to believe that Defendant was inside the Hogan. *See Fisher v. City of San Jose*, 558 F.3d 1069 (9th Cir.

2009) (stating that a Defendant "cannot undermine his lawful warrantless arrest—nor can he increase his constitutional protections—by hiding within the four walls of his residence, readying his arsenal as a means to resist officers' reasonable efforts to take him into full physical custody."); *Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1171 (9th Cir. 2003) ("Even in the absence of hot pursuit, the gravity of the crime and likelihood that the suspect is armed may be considered when weighing the risk of danger."). Accordingly, the police were justified in the warrantless arrest of Defendant based on exigent circumstances.

### IV.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence Seized in Violation of the Fourth Amendment (Doc. 39) is denied.

Dated this 2nd day of November, 2012.

James A. Teilborg
United States District Judge